Slip Op. 11-53

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | | |
|---|---|---|
| SHANDONG TTCA BIOCHEMISTRY CO., LTD., et al., | : : : | |
| Plaintiffs, | : : | |
| v. | : : | |
| UNITED STATES, | : : | Before:      WALLACH, Judge Consol. Court No.:   09-00241 |
| Defendant, | : : | |
| and | : : | **PUBLIC VERSION** |
| CARGILL, INCORPORATED, et al., | : : | |
| Defendant-Intervenors. | : : | |

[Plaintiffs' Motion for Judgment Upon the Agency Record is DENIED, and the Commission's Final Determination is AFFIRMED]


Dated:                    May 11, 2011


Troutman Sanders, LLP (Julie C. Mendoza, Donald B. Cameron, R. Will Planert, Brady W. Mills, and Mary S. Hodgins) for Plaintiffs Shandong TTCA Biochemistry Co., Ltd., et al.

James M. Lyons, General Counsel, Andrea C. Casson, Assistant General Counsel, U.S. International Trade Commission (Mary Jane Alves) for Defendant United States.[1]

Sidley Austin, LLP (Neil R. Ellis and Jill Caiazzo) for Defendant-Intervenors Cargill, Incorporated, Archer Daniels Midland Co., and Tate & Lyle Americas LLC.

---

[1] Tony West, Assistant Attorney General; Jeanne E. Davidson, Director, Franklin E. White, Jr., Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Carrie Anna Dunsmore) appeared for Defendant United States "to the limited extent that any party requests that the Court issue a preliminary injunction that affects an agency of the United States other than the International Trade Commission." Department of Justice's Form 11 Notice of Appearance, Docket No. 10, ¶ 1.

## OPINION

**Wallach, Judge:**

# I
# INTRODUCTION

Plaintiffs Shandong TTCA Biochemistry Co., Ltd., <u>et al.</u> ("Plaintiffs")[2] challenge the

United States International Trade Commission's ("Commission" or "ITC") finding of material

injury in Citric Acid and Certain Citrate Salts from Canada and China, Inv. Nos. 701-TA-456 and

731-TA1151-1152 (Final), USITC Pub. 4076 (May 2009) ("Final Determination"), Public

Record ("P.R.") 230.[3]   The court has jurisdiction pursuant to 28 U.S.C. § 1581(c).  Plaintiffs'

Shandong TTCA Biochemistry Co., Ltd., <u>et al.</u> Motion for Judgment Upon the Agency Record is

DENIED.  The Commission's finding of material injury is supported by substantial evidence and

otherwise in accordance with law.

# II
# BACKGROUND

On April 14, 2008, three domestic producers of citric acid petitioned the United States

Department of Commerce ("Commerce") and the Commission for the imposition of antidumping

duties on imports of citric acid from Canada and the imposition of both antidumping and

countervailing duties on imports of citric acid from China. Citric Acid and Certain Citrate Salts

from Canada and the People's Republic of China: Initiation of Antidumping Duty Investigations,

---

[2] "Plaintiffs" in this case are Plaintiffs Shandong TTCA Biochemistry Co., Ltd., Yixing-Union Biochemical Co., Ltd., RZBC Group, Anhui BBCA Biochemical Co., Ltd., Weifang Ensign Industry Co., Ltd., Huangshi Xinghua Biochemical Co., Ltd., Huozhou Coal Electricity Shanxi Fenhe Biochemistry Co., Ltd., A.H.A. International Co., Ltd., Laiwu Taihe Biochemistry Co., Ltd., Gansu Xuejing Biochemical Co., Ltd., Hunan Dongting Citric Acid Chemicals Co., Ltd., Shihezi City Changyun Biochemical Co., Ltd., Jiali International Corp., Lianyungang Shuren Scientific Creation Imp & Exp Co., Ltd., Jiangsu Gadot Nuobei Biochemical Co., Ltd., and Changsha Glorysea Biochemicals Co., Ltd. Complaint, Docket No. 9, at 1.

[3] Notice of this determination was published at Citric Acid and Certain Citrate Salts from Canada and China, 74 Fed. Reg. 25,771 (May 29, 2009).

73 Fed. Reg. 27,492, 27,492 (May 13, 2008); Notice of Initiation of Countervailing Duty

Investigation: Citric Acid and Certain Citrate Salts from the People's Republic of China, 73 Fed.

Reg. 26,960, 29,960 (May 12, 2008).[4]  The period of investigation ("POI") covers the years 2006

through 2008. Final Determination at 4.

    Following affirmative determinations by Commerce, the Commission proceeded to make

a final determination as to material injury for each of the three investigations. Id. at 1; see 19

U.S.C. §§ 1671d(b), 1673d(b).  In making these determinations, the Commission considered

three statutory factors:

> (I) the volume of imports of the subject merchandise, (II) the effect
> of imports of that merchandise on prices in the United States for
> domestic like products, and (III) the impact of imports of such
> merchandise on domestic producers of domestic like products . . . .

19 U.S.C. § 1677(7)(B)(i); see Final Determination at 15-37.  The Commission considered these

factors by "cumulatively assess[ing] the volume and effects of imports of the subject

merchandise" from Canada and China. 19 U.S.C. § 1677(7)(G); Final Determination at 15.[5]

    At the close of the injury investigation, the Commission reached multiple conclusions

that are of importance, finding in its volume analysis that the "large and increasing volume of

subject imports have had significant adverse effects on prices of the domestic like product" and

finding in its pricing analysis that subject imports created a "cost-price squeeze" effect on the

---

[4] "Citric acid," as used in this opinion, collectively refers to all of the products covered by the scope of this review, i.e., "crude and finished citric acid and two downstream products made from citric acid – sodium citrate and potassium citrate." Memorandum of Defendant United States International Trade Commission in Opposition to Plaintiffs' Brief for Judgment on the Agency Record ("Defendant's Opposition") at 4; see Plaintiffs' Brief in Support of Motion for Judgment Pursuant to Rule 56.2, as corrected by Errata Memorandum ("Plaintiffs' Brief") at 4 n.3. "Citric acid is a chemical used in a wide variety of applications, including as an acidulant, preservative, and flavor enhancer in the food and beverage industry, as well as in the production and formulation of pharmaceuticals, cosmetics, detergents, metal cleaners, and other household and commercial products." Plaintiffs' Brief at 4 (internal footnote omitted).

[5] The Commission conducted its material injury analysis "on a cumulated basis"; however, Plaintiffs only challenge the Commission's determinations with respect to China. Plaintiffs' Brief at 5 n.4; see Shandong TTCA Biochemistry Co. v. United States, 710 F. Supp. 2d 1368 (CIT 2010) (denying a Canadian producer's motion to intervene in the instant action).

domestic industry while "the pricing data present a varied picture that is consistent with a finding

of significant underselling." Final Determination at 28-29 and 32.  Additionally, the Commission

found that intra-industry competition did not explain all of the pricing pressure faced by the

domestic industry. <u>Id.</u> at 31-32.  Overall, the Commission determined that "an industry in the

United States is materially injured by reason of imports of citric acid . . . from . . . China that

[Commerce] found to be sold at less than fair value and imports from China that Commerce

found to be subsidized by the Government of China." Final Determination at 1 (footnote

omitted).

      After receiving notification of the Commission's determinations, Commerce issued two

antidumping duty orders and one countervailing duty order. <u>See</u> Citric Acid and Certain Citrate

Salts from Canada and the People's Republic of China: Antidumping Duty Orders, 74 Fed. Reg.

25,703, 25,703 (May 29, 2009); Citric Acid and Certain Citrate Salts From the People's Republic

of China: Notice of Countervailing Duty Order, 74 Fed. Reg. 25,705, 25,705 (May 29, 2009).

      Plaintiffs brought the instant action challenging "the final affirmative injury

determination of the [Commission] concerning imports from China of citric acid." Complaint,

Docket No. 9, ¶ 1.  "Plaintiffs are Chinese producers and exporters to the United States of citric

acid from China." <u>Id.</u> ¶ 3.

### III
### STANDARD OF REVIEW

      The court will hold unlawful an injury determination by the Commission if that

determination is "unsupported by substantial evidence on the record, or otherwise not in

accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); <u>see</u> 19 U.S.C. § 1516a(a)(2)(B)(i).

Substantial evidence means "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." <u>Pierce v. Underwood</u>, 487 U.S. 552, 565, 108 S. Ct. 2541, 101 L. Ed. 2d 490 (1988) (citation omitted).  "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." <u>Matsushita Elect. Indus. Co. v. United States</u>, 750 F.2d 927, 933 (Fed. Cir. 1984) (citation omitted).

The reviewing court may not, "even as to matters not requiring expertise . . . displace the [agency's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it <u>de novo</u>." <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 488, 71 S. Ct. 456, 95 L. Ed. 456 (1951).  In this regard "the court may not reweigh the evidence, or substitute its judgment for that of the ITC." <u>Dastech Int'l, Inc. v. USITC</u>, 21 CIT 469, 470, 963 F. Supp. 1220 (1997); <u>Timken Co. v. United States</u>, 12 CIT 955, 962, 699 F. Supp. 300 (1988), <u>aff'd</u>, 894 F.2d 385 (Fed. Cir. 1990).[6]

## IV
## DISCUSSION

In order to make a final affirmative determination in its injury investigations, the Commission must find that:

> (A) an industry in the United States--
>    (i) is materially injured, or
>    (ii) is threatened with material injury, or
> (B) the establishment of an industry in the United States is
>        materially retarded,
>    by reason of imports, or sales (or the likelihood of sales) for
>    importation . . . .

---

[6] The Federal Circuit has held that although "Commerce has broad discretion in making antidumping determinations," that agency still must make determinations that "represent commercial reality." <u>Gallant Ocean (Thail.) Co. v. United States</u>, 602 F.3d 1319, 1323 (Fed. Cir. 2010).  Since the <u>Gallant</u> standard of review, one of upholding determinations unless unsupported by substantial evidence or otherwise not in accordance with law, also applies here, the "commercial reality" limitation on agency discretion appears equally applicable to both Commerce and the Commission. <u>Id.</u>

19 U.S.C. § 1671d(b)(1); 19 U.S.C. § 1673d(b)(1).  With respect to less than fair value ["LTFV"]

imports, "material injury" is defined as "harm which is not inconsequential, immaterial, or

unimportant." 19 U.S.C. § 1677(7)(A).  "When determining the causal connection between

imports and material injury, 'the Commission is required to consider three factors . . . : 1) the

volume of imports, 2) the effect of imports on prices of like domestic products, and 3) the impact

of imports on domestic producers of like products.'" Cleo Inc. v. United States, 30 CIT 1380,

1390 (2006) (citing USX Corp. v. United States, 11 CIT 82, 84, 655 F. Supp. 487 (1982) (citing

19 U.S.C. § 1677(7)(B))).  In addition, the Commission "may consider such other economic

factors as are relevant to the determination regarding whether there is material injury by reason

of imports." 19 U.S.C. § 1677(7)(B)(ii).

　　　"The presence or absence of any factor which the Commission is required to evaluate [in

these cases] shall not necessarily give decisive guidance with respect to the determination by the

Commission of material injury." 19 U.S.C. § 1677(7)(E)(ii).  "The flexibility afforded to the ITC

is evinced by the legislative history . . . .  No factor, standing alone, triggers a per se rule of

material injury." Am. Spring Wire Corp. v. United States, 8 CIT 20, 23, 590 F. Supp. 1273 (1984)

(citing S. Rep. No. 96-249 at 88 (1979), reprinted in 1979 U.S.C.C.A.N. 381, 474 ("The

significance of the various factors affecting an industry will depend upon the facts of each

particular case. Neither the presence nor the absence of any factor listed in the bill can

necessarily give decisive guidance with respect to whether an industry is materially injured.")).

　　　Plaintiffs challenge the Commission's volume and price analyses as unsupported by

substantial evidence on the record. Plaintiffs' Brief in Support of Motion for Judgment Pursuant

to Rule 56.2, as corrected by Errata Memorandum ("Plaintiffs' Brief") at 9-36; see infra Parts

IV.A and IV.B.  Plaintiffs also argue that the Commission failed to demonstrate that it avoided

attributing injury from intra-industry competition to subject imports. Plaintiffs' Brief at 36-39; see infra Part IV.C.  For the reasons stated below, the Commission's determinations are supported by substantial evidence on the record.

**A**
**The Commission's Volume Analysis Is Supported By Substantial Evidence**

When examining the volume of imports, the Commission is directed by statute to "consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant." 19 U.S.C. § 1677(7)(C)(i).

The Commission found, and Plaintiffs do not contest, that "the volume of subject imports is significant, both absolutely and relative to consumption and production in the United States." Final Determination at 25; see Memorandum of Defendant United States International Trade Commission in Opposition to Plaintiffs' Motion for Judgment on the Agency Record ("Defendant's Opposition") at 10-13 (capitalization modified).[7]  All parties also agree that U.S. "consumption of citric acid increased by [[ a certain ]] percent over the three year POI." Plaintiffs' Brief at 10; see Defendant's Opposition at 13 (characterizing this increase as "strong and growing demand"); Response Brief of Defendant-Intervenors Archer Daniels Midland Company, Cargill, Incorporated, and Tate & Lyle Americas LLC ("Defendant-Intervenors' Response") at 6.  However, Plaintiffs argue that the increase in subject import volumes, and the associated increase in share of U.S. consumption, was at the expense of non-subject imports and not the domestic industry. Plaintiffs' Brief at 10 ("[S]ubject imports gained only [[ certain ]] percentage points of market share from the domestic industry, . . . all of which came in 2008.

---

[7] "It was uncontested that subject imports had been present in the U.S. market in significant volumes for a long period of time." Reply Brief of Plaintiffs Shandong TTCA Biochemistry Co., Ltd. et al. ("Plaintiffs' Reply") at 2 n.1.  "We are not appealing the Commission's findings that imports increased significantly in a purely numerical calculation." Plaintiffs' Brief at 9.

Imports did not take market share from the domestic industry in 2007.").  Plaintiffs also assert that the Commission failed to consider that the domestic industry was operating at full capacity and hence incapable of taking advantage of strong demand. Id. at 11-14.

The Commission found that "[c]umulated subject imports, which were already large, increased faster than demand, first taking market share from non-subject imports and then the domestic industry.  As the domestic industry's costs increased, the significant and increasing volume of cumulated subject imports put downward pressure on prices, precluding the domestic industry from reaping the benefits of the increasing demand." Final Determination at 35.[8]  The Commission found that the domestic industry "was unable to operate at full capacity at any point during the POI, despite strong and growing U.S. demand," Defendant's Opposition at 28, notwithstanding the finding that "the domestic industry's capacity utilization levels increased from  85.8 percent in 2006 to 88.2 percent in 2007 and 91.7 percent in 2008," Final Determination at 33 n.228.  Defendant argues that "[t]he record thus supported the Commission's finding that the significant and significantly increasing low-priced subject imports prevented the domestic industry from achieving greater output, higher capacity utilization, and a greater share of the strong and growing U.S. market." Defendant's Opposition at 28.

---

[8] Defendant overstates the Commission's findings. See Defendant's Opposition at 13 ("[B]y growing faster than the strong and growing demand, cumulated subject imports displaced both non-subject imports and the domestic industry throughout the 2006 to 2008 period, by capturing sales equivalent to nearly all increased demand throughout the POI in addition to causing market-share declines."  At oral argument, the court asked Defendant: "Did the Commission specifically say subject imports displaced the domestic industry throughout the period of investigation by capturing this percentage of apparent U.S. demand or this percentage if you are factoring [in that] non-subject imports lost some market share to subject imports?  Did it specifically say that?"; Defendant clarified: "No . . . . [But] the Commission made very clear throughout its opinion and especially in its volume analysis . . . apparent U.S. consumption was strong and increasing throughout the period.  If the U.S. market were static and there was no increase in demand . . . perhaps [Plaintiffs] might have more of an argument if there were only an increase between 2007 and 2008, but [Plaintiffs are] not taking into account the entire picture or the evidence underlying the record, which at the end of the day is what you are also looking at, whether or not . . . the Commission's determination [was] reasonable but [also] was it supported by the record, and in this case it certainly was." February 22, 2011 Oral Argument at 11:06:44-11:08:16.

The court "'must affirm a Commission determination if it is reasonable and supported by the record as a whole, even if some evidence detracts from the Commission's conclusion.' <u>Altx, Inc. v. United States</u>, 370 F.3d 1108, 1121 (Fed. Cir. 2004) . . . .  In short, we do not make the determination; we merely vet the determination." <u>Nippon Steel Corp. v. United States</u>, 458 F.3d 1345, 1352 (Fed. Cir. 2006); <u>see also</u> <u>supra</u> Part III.

Volume quantity, all parties agree, was significant, both in absolute and relative terms. Plaintiffs' Brief at 9; Defendant's Opposition at 10-13; Reply Brief of Plaintiffs Shandong TTCA Biochemistry Co., Ltd., <u>et al.</u> ("Plaintiffs' Reply") at 2 n.1; Defendant-Intervenors' Response at 5-7.[9]  Additionally, the Commission's causal connections between relative significant volume quantity and significant negative effect on the U.S. industry are reasonable and sufficiently explained.  As noted above, Plaintiffs concede that subject imports took [[ a certain ]] percent of the market share from the domestic industry in 2008. Plaintiffs' Brief at 10.  Such adverse effects on the domestic industry represent roughly [[ a certain amount ]] . Plaintiffs' Brief at 10; Final Determination at Table C-I.[10]  Beyond that, however, the Commission found the market share of both non-subject imports and the domestic industry was displaced by subject imports because subject imports "gr[ew] faster than the strong and growing demand." Defendant's Opposition at

---

[9] In terms of quantity, "[i]n finding the volume of cumulated subject imports from Canada and China to be itself significant in these investigations, the Commission observed that these imports numbered [[ a certain amount of ]] dry pounds and held over one-third of the market throughout the POI. It pointed to their large size relative to a U.S. market of between [[ a certain amount ]] and [[ a certain amount of ]] dry pounds and relative to non-subject imports (that were smaller and had a market share of [[ a percent falling within a range ]]) and the domestic industry's U.S. shipments of between 369.5 and 402.5 million dry pounds, output of between 475.4 and 507.9 million dry pounds, and market share of [[ a percent falling within a range ]] ." Defendant's Opposition at 10-11.  In terms of change over time, "[o]verall, subject imports increased [[ a certain ]] percent between 2006 and 2008 whereas demand as measured by apparent U.S. consumption only increased [[ a smaller ]] percent." Defendant's Opposition at 13.  "The prominence of subject imports in the U.S. market is even more dramatic when viewed over a longer term: from 2002 to 2008, subject import volumes nearly <u>tripled</u>." Defendant-Intervenors' Response at 7.

[10] [[ The percentage in question ]] is roughly equivalent to [[ a certain amount of ]] dollars. <u>See</u> U.S. International Trade Commission Staff Report to the Commission, Citric Acid and Certain Citrate Salts from Canada and China, Inv. Nos. 701-TA-456 and 731-TA-1151-1152 (Final) (April 2009), C.R. 322, as amended by U.S. International Trade Commission Corrections to the Staff Report, Citric Acid and Certain Citrate Salts from Canada and China, Inv. Nos. 701-TA-456 and 731-TA-1151-1152 (Final) (May 2009), C.R. 350 (collectively "Staff Report") at Table C-1 [[ (describing U.S. consumption values and domestic producers' market share) ]].

13; see supra note 8 ("In relative terms, '[o]verall, subject imports increased [[ a certain ]] percent between 2006 and 2008 whereas demand as measured by apparent U.S. consumption only increased [[ a smaller ]] percent.'"). The Commission's explanation is reasonable. Plaintiffs' interpretation, although also reasonable, is simply a different analysis of the same evidence and does not warrant displacement of an agency's determination.[11] See supra Part III.

With regards to the ability of the domestic market to take advantage of growing demand, the Commission reasonably relied on record evidence that the domestic industry was not operating at full capacity. See U.S. International Trade Commission Staff Report to the Commission, Citric Acid and Certain Citrate Salts from Canada and China, Inv. Nos. 701-TA-456 and 731-TA-1151-1152 (Final) (April 2009), Confidential Record ["C.R."] 322, as amended by U.S. International Trade Commission Corrections to the Staff Report, Citric Acid and Certain Citrate Salts from Canada and China, Inv. Nos. 701-TA-456 and 731-TA-1151-1152 (Final) (May 2009), C.R. 350 (collectively "Staff Report") at III-3, Table III-2 (reporting domestic capacity utilization in 2006 as 85.8 percent, in 2007 as 88.2 percent and in 2008 as 91.7 percent).[12]  Based on these numbers, it was reasonable for the Commission to conclude there was excess capacity.

Plaintiffs cited as evidence of domestic capacity constraints reported supply shortages. Plaintiffs' Brief at 11-14.  The Commission, in response, found that the inability to fully "supply all of demand does not mean that the domestic industry cannot be materially injured," that the

---

[11] Plaintiffs argue that "[t]he record evidence . . . contains strong evidence that the modest decline in domestic market share in 2008 reflected the inability of domestic producers to continue to increase supply sufficiently to keep pace with the additional increase in market demand, and not subject imports 'taking business away' from the domestic industry." Plaintiffs' Reply at 3.

[12] The Commission is directed to examine the domestic industry "as a whole." 19 U.S.C. § 1677(4)(A). See SKF USA Inc. v. United States, 30 CIT 1433, 1440, 451 F. Supp. 2d 1355 (2006) ("To make a distinction between individual producers within an industry is incongruous with the fundamental purpose of the antidumping statute, that is to remedy the injurious [e]ffects of dumping to the domestic industry as a whole."), rev'd on other grounds, 556 F.3d 1337 (Fed. Cir. 2009).

Plaintiffs' "claims concerning the [un]reliability of the domestic industry [were] exaggerated,"[13] and that the Plaintiffs failed to take into account that purchasers can choose from among three suppliers in the domestic market.[14] Final Determination at 35-36.  The Commission found that "many of the purchaser complaints about lack of supply pertain to 2008 and 2009, after our [POI] and/or after imposition of the requirement for antidumping and countervailing duty deposits on subject imports." Final Determination at 36 n.245.  As Defendant pointed out at oral argument:

> As the Commission's record shows, in all of 2006 and 2007, there are only two complaints related to supply, only one of which applied to the domestic industry . . . .  [A]s for 2008, there were shortages . . . [but] the Commission's evidence reflected that there were supply issues not only with the domestic industry but also with imports from China, imports from Canada, and imports from non-subject countries.  As the Commission also explained, in 2008 most of these complaints pertained to one of two events.  One was a one-time event involving Cargill.  The second was the imposition of Commerce's preliminary determinations . . . .  Regarding the first event . . . .  This event was entirely unrelated to any actions by Cargill.  Cargill notified its customers immediately of a potentially serious outage.  In the end, however, as Cargill testified and as the Commission's data showed, the outage was nowhere nearly as serious or as long term as initially forecast.  In the end Cargill lost only one week of production . . . .  The other major event . . . it's not unusual in situations like this where you suddenly have an imposition of duties . . . for there to be a little bit of uncertainty in the market . . . .

February 22, 2011 Oral Argument at 12:08:47-12:11:36.

---

[13] See Post-hearing Brief of Petitioners Archer Daniels Midland Company, Cargill, Incorporated, and Tate & Lyle Americas, Inc. (April 15, 2009), C.R. 318 and P.R. 183, Ex. 3 at 2-3 ("Despite certain unsubstantiated statements made at the hearing, the citric acid industry is not characterized by chronic reliability problems . . . .  [Mr. Peter Lorusso of TLC Ingredients] is familiar with the supply reliability of hundreds of different industries producing chemicals and food ingredients. According to Mr. Lorusso, far from being an unreliable industry, citric acid is one of the most consistently performing and reliable industries that he deals with.  A similar conclusion is offered by [[ another regional distributor of food ingredients ]] . . . .").

[14] See Defendant's Opposition at 30 ("Shandong failed to consider, the Commission explained, that purchasers seeking multiple sources had 'three domestic producers from which to choose, provided that they [were] willing to pay domestic prices' . . . (a point that was illustrated by [[ a particular response to certain supply conditions ]] )) (internal punctuation and citations omitted).

The Commission could reasonably conclude, based on its inquiry, that the presence of subject imports prevented the domestic industry from taking full advantage of the growing demand. The Commission's overall determinations that subject import volumes were significant and the gains occurred at the expense of the domestic industry are supported by substantial evidence on the record.[15]

**B**
**The Commission's Price Analysis Is Supported By Substantial Evidence**

Under the second prong of the Commission's inquiry, "the effect of imports of that merchandise on prices in the United States for domestic like products," 19 U.S.C. § 1677(7)(B)(i)(II), the Commission is directed to consider two questions: whether "there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States," 19 U.S.C. § 1677(7)(C)(ii)(I), and whether "the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree," 19 U.S.C. § 1677(7)(C)(ii)(II).

**1**
**The Commission's Finding Of Subject Import Underselling Is Supported By Substantial Evidence**

In considering price effects, the Commission focused on three inquires.  First, the Commission "requested extensive pricing data tailored to products sold and pricing practices of the industry" and found "underselling by subject imports in 139 instances or 60 percent of all

---

[15] Plaintiffs also assert that the Commission failed to consider that "approximately 21 percent of the domestic producers' total shipments during the POI consisted of export shipments." Plaintiffs' Brief at 14.  The Commission did, however, briefly "note that the domestic industry's exports, some of which are to affiliated companies, fell in 2009 as domestic producers were able to divert some of these sales back to the U.S. market once prices began to improve." Final Determination at 36 n.245.  As pointed out by Defendant, the Commission "considered the domestic industry's exports, acknowledged some were to affiliates, and reasonably concluded exports could be diverted to the U.S. market if not for subject imports." Defendant's Opposition at 30.

possible quarterly comparisons, at 12.7 percent average margins." Defendant's Opposition at 15-16.  Noting "the data were . . . mixed," the Commission "analyz[ed] [the] record data from various angles," concluding significant underselling. Id. at 16-17.  The Commission next turned to "contract transactions in isolation," "[b]ecause the domestic industry's sales were highly concentrated in contracts (rather than spot sales) and [Plaintiffs] had argued that contract sales were important to the domestic industry," finding "cumulated subject imports undersold domestic products 44 percent of the time (31 of 72 quarterly observations), equal to nearly one-third of the domestic industry's quantities for these transactions." Id. at 19.  In addition, the Commission examined "other probative record evidence," id. at 17; "[s]pecifically, most purchasers reported that subject imports were lower-priced than domestic products, purchasers' pricing data showed mostly underselling by subject imports, and purchasers' bid data also showed priced-based competition," id. at 20.

Plaintiffs argue that the Commission's conclusion of significant price underselling is incorrect because "the vast majority of the domestic industry's sales volume faced overselling by subject imports." Plaintiffs' Brief at 17 (capitalization modified), 15-22.  Plaintiffs assert that the way in which the Commission aggregated and discounted certain data in their overselling analysis distorts the full picture, alleging significant problems with the Commission's analysis throughout. Id. at 17-22.[16]  Indeed, Plaintiffs state that "the Commission . . . gerrymandered its underselling analysis to the point where it was left with 28 instances of underselling and 35

---

[16] More specifically, Plaintiffs point out that, for the first product examined, the Commission used the same number of comparisons for spot-market sales (which tended towards underselling) as for contract sales to end-users (which tended towards overselling), even though the former were de minimis in comparison to the latter. Plaintiffs' Brief at 18-19.  Plaintiffs also point out that the Commission's focus on the "contract segment of the market," although  "seemingly reasonable," "had the effect of ignoring all the quarterly pricing data for Products 4 and 5 (citrate salts) because the Commission did not request price breakouts for contract and spot sales for these pricing products," thus reducing the number of instances of overselling. Id. at 19.  In this analysis, Plaintiffs also argue that the Commission discounted "all instances and margins of overselling after the first quarter of 2008 for Products 1-3." Id. at 20.  The following discussion addresses Plaintiffs' arguments.

instances of overselling," id. at 21-22, where originally, in "108 quarterly comparisons, imports oversold the domestic industry in 80 instances . . . and undersold subject imports in only 28 instances." id. at 17.[17]  Plaintiffs also assert that the Commission never linked this "gerrymandered summary of instances of import underselling to any adverse effect on the domestic industry," stating that "the patterns and linkages the Commission usually relies on to connect underselling to adverse impact are wholly absent from this record." Id. at 22. Essentially, Plaintiffs contend that the Commission's methodology was incorrect and that the Commission did not adequately explain the causal analysis that led to its conclusions.  This, however, is not the case.

It is within the Commission's discretion to chose the methodology used, as long as the methodology is reasonable. See U.S. Steel Group - A Unit of USX Corp. v. United States, 96 F.3d 1352, 1361-1362 (Fed. Cir. 1996) ("At bottom, [the appellant] seeks a ruling from this court that there should be a single methodology, applicable to each of the commissioners, for determining whether a domestic industry is injured, or threatened with injury, by reason of subsidized and/or LTFV imports.  The statute on its face compels no such uniform methodology, and we are not persuaded that we should create one, even were we so empowered.").

First, with regards to the scope of analysis, it was proper for the Commission to conduct an analysis of the entire market. See NSK Corp. v. United States, 577 F. Supp. 2d 1322, 1340 (CIT 2008) ("It is well settled that the ITC bears no obligation to perform a market segmentation analysis . . . .  The ITC 'd[oes] not err in basing its determination on data representing the experience of the domestic industry as a whole, rather than on the experience of [different

---

[17] Plaintiffs do, however, note that "[i]f all quarterly pricing comparisons are counted, including spot and distributor pricing categories that accounted for only de minimis domestic quantities, there were there were 139 instances of underselling and 92 instances of overselling." Plaintiffs' Brief at 18.  Plaintiffs conclude these results are statistically spurious. See id.; supra note 15.

segments of the industry] separately.'") (quoting <u>Tropicana Prods., Inc. v. United States</u>, 31 CIT 548, 560, 484 F. Supp. 2d 1330 (2007)) (brackets in original).

Second, the Commission reasonably focused on the contract segments of the market in determining the breadth of its investigation.  Defendant explained, as noted above, that the Commission turned to the contract segment "[b]ecause the domestic industry's sales were highly concentrated in contracts (rather than spot sales) and [Plaintiffs] had argued that contract sales were important to the domestic industry."  Defendant's Opposition at 19 (citing Views of the Commission (Final), Citric Acid and Certain Citrate Salts from Canada and China, Inv. Nos. 701-TA-456 and 731-TA-1151-1152 (Final) (May 2009) ("Views of the Commission"), C.R. 348). Defendant noted "[t]he pricing data . . . collected in the final investigations provided broad coverage and were clearly representative, accounting for the majority of U.S. shipments of each of domestic, Canadian, and Chinese products." <u>Id.</u> at 16 (citing Staff Report at V-17 ("Three U.S. producers, [[ a certain number of  importers ]] of Canadian product, and 21 importers of Chinese product provided usable pricing data for sales of the requested products . . . .   Pricing data reported by these firms accounted for approximately 56.3 percent of U.S. producers' U.S. shipments of citric acid and certain citrate salts, [[ a certain ]] percent of U.S. shipments of subject imports from Canada, and 60.0 percent of U.S. shipments of subject imports from China in 2008") (internal footnotes omitted)).  As Plaintiffs conceded, turning to the contract market segment was reasonable, Plaintiffs' Brief at 19; the Commission then reasonably determined that a focus on the first three "pricing products" examined would offer sufficient information for the more detailed pricing analysis the Commission conducted, <u>see</u> Defendant's Opposition at 16 ("Given that it was already asking them to report separate distributor and end-user prices for all five pricing products, to limit the burden on questionnaire recipients, the Commission only

requested that they segregate pricing data by spot and contract sales for three of the products 'that accounted for a large portion of the U.S. market.'").[18]

Third, the Commission reasonably made use of the pricing data from the last three quarters of 2008;[19] the Commission explained the data were distorted from petition effects, id. at 27, effects recognized in 19 U.S.C. § 1677(7)(I).[20]   The Commission stated that "the record indicates that the filing of the petitions in April 2008 affected prices in the U.S. market; subject import prices, even for contract sales (particularly for China), rose substantially over the course of 2008." Final Determination at 27.   The Commission further explained that "the prices of subject imports reacted sooner [than domestic merchandise] to the April 2008 filing of the petitions" because most domestic merchandise was sold through long-term contracts whereas

---

[18] "In the final phase of these investigations, staff gathered quarterly pricing data on five products.  For products 1-3, the pricing data were gathered by spot sales to end users, contract sales to end users, spot sales to distributors, and contract sales to distributors.  For products 4 and 5, data were gathered by sales to end users and sales to distributors." Final Determination at 42 (Aranoff, Shara L., Pearson, Daniel R., and Okun, Deanna Tanner, separate and dissenting views) (internal footnote omitted).  The five products are "two dry citric acid products, one citric acid in solution product, one sodium citrate product, and one potassium citrate product." Id. 42 n.28.

[19] Plaintiff argues that the Commission "discounted all instances and margins of overselling after the first quarter of 2008 for Products 1-3." Plaintiffs' Brief at 20.  However, as pointed out by counsel in oral argument, the Commission discussed this post-petition information. February 22, 2011 Oral Argument at 12:57:12-12:57:24. (citing Views of the Commission at 35-36 ("We also note that the relative instances of overselling and underselling changed after the filing of the petitions in the first quarter of 2008 and the underselling was much more prevalent prior to that time.")).

[20] "The Commission shall consider whether any change in the volume, price effects, or impact of imports of the subject merchandise since the filing of the petition in an investigation under [19 U.S.C. §§ 1671-1671h or 1673-1673h] is related to the pendency of the investigation and, if so, the Commission may reduce the weight accorded to the data for the period after the filing of the petition in making its determination of material injury, threat of material injury, or material retardation of the establishment of an industry in the United States." 19 U.S.C. § 1677(7)(I).

subject imports were more likely to be sold through other mechanisms. Id. at 28 n.190.[21]  Finally, additional record evidence in the form of responses to questionnaires supports the Commission's finding. Id. at 28 ("[M]ost purchasers considered subject imports to be lower-priced than the domestic like product."). But see Plaintiffs' Reply at 9 ("Among the 12 largest purchasers, 6 of the 8 purchasers who responded to the [relevant] question reported that the imports were either comparable to or priced higher than domestic prices, and only 2 reported that imports were priced lower.").

 Although Plaintiffs' preference for their own methodology is understandable, the Commission is correct that "the focal point on appeal is not what methodology [Plaintiffs] would prefer, but on whether the methodology actually used by the Commission was reasonable." Defendant's Opposition at 18.  Plaintiffs have not demonstrated that the Commission acted unlawfully while conducting its underselling analysis; the record shows that the Commission conducted a thorough investigation and explained the methodology used and the causal

---

[21] Additionally, Plaintiffs take issue with "[t]he inconsistency between the Commission's rejection of price trends in 2008 and the reliance on volume trends in the same year"; that is, "[i]f filing of the petition caused import prices to increase in anticipation of the imposition of antidumping duties, then how did imports at the same time increase in volume and gain market share even as [exporters] increased prices to levels substantially above the prices of the domestic industry?" Plaintiffs' Brief at 21.  This is also explained, however, by petition effects. See Pre-hearing Brief of Petitioners Archer Daniels Midland Company, Cargill, Incorporated, and Tate & Lyle Americas, Inc. (March 31, 2009) (C.R. 284 and P.R. 161), app. 4 (Statement of Michael R. Baroni, Archer Daniels Midland Company, President, Specialty Food Ingredients Division) at 2 (stating that many U.S. customers attempted to stockpile Chinese citric acid before the preliminary determinations were issued in these investigations, resulting in large quantities of citric acid from China being imported late summer and early fall of 2008 and spot prices increasing in late 2008 in the U.S. market.); id. at 65 ("The same phenomenon had been observed in the EU just several months earlier: even though Chinese imports increased dramatically in the months leading up to the imposition of preliminary measures, spot prices also increased substantially, in anticipation of restricted availability of Chinese supply after the preliminary measures had taken effect.").

connections made.[22]  Therefore, the Commission's underselling analysis is supported by substantial evidence.

**2**
**The Commission's Finding Of Cost Suppression Of Domestic Prices Caused by Subject Imports Is Supported By Substantial Evidence**

As noted above, the Commission also must consider whether "the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree." 19 U.S.C. § 1677(7)(C)(ii)(II). Plaintiffs have two main arguments; first, there is no "evidence of price suppression beyond 2007" and, second, even if there were, the Commission did not show that subject imports caused this price suppression. Plaintiffs' Brief at 27, 32.[23]  Plaintiffs assert that the Commission was "simply wrong" to find that "'the domestic industry was not able to increase its prices to levels that were sufficient to cover the increase[] in its costs.'" Id. at 25 (quoting Final Determination at 28).  Plaintiffs argue the Commission erred when it determined that price suppression was caused by subject imports, particularly imports that "oversold the domestic industry." Id. at 24-25.[24]  In particular, Plaintiffs contend that neither the overselling margins nor the increased import volumes established a "causal nexus" to a "cap" on domestic prices. Id. at 27-32.

The Commission contends that "[e]ven though many of the resulting subject import prices for the 2007 contracts were at, or somewhat above, domestic prices, the pricing pressure

---

[22] As explained below, see infra Part IV.A.2, the Commission demonstrated price suppression sufficient to make a reasonable determination on price effects. See Cemex, S.A. v. United States, 16 CIT 251, 260-61, 790 F. Supp. 290 (1992) ("[A] finding of underselling is not crucial to an affirmative determination.  A finding of suppressive price effects may be sufficient . . . .  To require findings of underselling would be inconsistent with the proposition that price suppression or depression is sufficient."), aff'd, 989 F.2d 1202 (Fed. Cir. 1993); Florex v. United States, 13 CIT 28, 40, 705 F.Supp. 582 (1989).

[23] All parties use cost of goods sold ("COGS")-to-net-sales ratio as a potential indicator for price suppression. Defendant's Opposition at 25; Plaintiffs' Brief at 25; Defendant-Intervenors' Response at 22.

[24] "To the best of our knowledge, this is the first case in which the Commission has found that overselling by subject imports, of what the Commission determined to be a commodity product, had the effect of significantly suppressing domestic prices." Plaintiffs' Brief at 25.

from the large and increasing volume of cumulated subject imports made it impracticable for the domestic industry to increase its prices to the degree that would have been required to recover its increasing production costs." Final Determination at 29.  The Commission stresses that such an inquiry is directed by statute and that particular deference is due where the Commission uses its standard methodology, here by "examin[ing] the domestic industry's COGS-to-net-sales ratio," where "COGS" is "cost of goods sold."  Defendant's Opposition at 21-23.

All parties agree that "the domestic industry's unit-COGS-to-net sales ratio was 98.6 percent in 2006, 103.6 percent in 2007, and 97.9 percent in 2008." Id. at 25; Plaintiffs' Brief at 25; see Defendant-Intervenors' Response at 22.  However, the parties' interpretations of these numbers differ greatly.  Plaintiffs contend these numbers indicate that the "domestic industry was able to increase prices sufficiently by the end of the POI to have fully passed through all of the cost increases it had experienced over the POI," noting additionally however that "[t]hese data would support, at most, a finding of price suppression in 2007, when the COGS-to-sales ratio increased." Plaintiffs' Brief at 26.[25]  However, according to the Commission, Plaintiffs "appear to assume [without support] that an improved COGS-to-net sales ratio over the POI equals no significant price suppression and that a ratio of less than 100 percent that is nevertheless high equals no significant price suppression." Defendant's Opposition at 25.

In this case, the record evidence and the Commission's COGS-to-net-sales ratio analysis led the Commission to reasonably conclude there was price suppression. See Defendant's

---

[25] Plaintiffs explain the price suppression in 2007: "In that year costs for corn and energy increased substantially, and as a result, the [domestic] industry's COGS-to-sales ratio increased to [103.6] percent and operating losses grew worse"; the industry was unable to adequately respond because it was locked into fixed-price contracts with no escalator clauses. Plaintiffs' Brief at 32-33.  Defendant responds that "corn prices actually rose substantially in the latter part of 2006 . . . .  [P]rospects for increases in corn prices above the average 2006 levels were not unknown to the domestic industry in the last quarter of 2006 when it was negotiating its 2007 contracts . . . .  [T]he domestic industry still was unable to secure adequate price increases to recover the 2007 cost increase due to pricing pressure from the significant and significantly increasing subject imports." Defendant's Opposition at 34-35 (citing Staff Report at 39-40).

Opposition at 25. The "razor-thin profit margins experienced in 2006 and 2008" coupled with the loss sustained in 2007 reasonably indicate the inability of U.S. producers to increase their price above cost in a strong demand market. Defendant-Intervenors' Response at 22-23.[26] Indeed, Plaintiffs, although attributing the losses to other sources, admit that the domestic industry suffered from "substantial operating losses." Plaintiffs' Brief at 26; Final Determination at 34 ("The domestic industry's $10.7 million operating loss in 2006 deteriorated to a $21.6 million operating loss in 2007 before improving somewhat, but still remaining significant, as the industry posted a $7.5 million operating loss in 2008."). Additionally, the record shows for all years during the POI, the major domestic producers were aware of and affected by the volume levels and resulting market position of the Chinese producers.[27] The Commission found that "[m]ost purchasers, 76.9 percent, reported that the presence of Chinese products reduced the price" in contract negotiations. Final Determination at 32 n.216.

---

[26] Plaintiffs contest in particular the Commission's price analysis for the year 2008 when the domestic industry "was able to negotiate 2008 contract prices that were higher than the import prices prevailing at the time the contracts were negotiated." Plaintiffs' Motion at 29-30. Plaintiffs ask "in what sense were imports acting as a price cap," given these conditions. Id. at 30. However, as Defendant points out, Plaintiffs "miss the point. The relevant consideration here is whether cumulated subject imports prevented price increases that otherwise would have occurred to a significant degree . . . . As a factual matter, the Commission explained that prices increased, but not to the degree that otherwise would have occurred." Defendant's Opposition 35-36.

[27] See Mark Christiansen, Acidulants Sales Manager, Corn Milling, at Cargill, Incorporated, International Trade Commission Hearing Transcript (April 8, 2009) (P.R. 168) at 43:7-9, 44:10-18 ("[T]here is substantial capacity in excess of domestic requirements in only two regions of the world: Canada and China. That capacity can be and has been engaged to serve the U.S. market. Our major customers negotiate with Canadian and Chinese producers, and many purchase from them or use their prices as leverage in the negotiations. I cannot ignore this fact in my negotiation strategy."); Curtis Poulos, Commercial Director of Food Ingredients and Acidulants at Tate & Lyle Americas, Inc., id. at 33:18-20, 38:22-39:11 ("The market impact posed by Chinese and Canadian imports is not lost on our customers. As you know, this industry is characterized by a few large, multi-national customers with significant market power. They enjoy a clear view of what is happening in China and Canada because they actively participate in these countries. They purchase on a global basis from multiple qualified suppliers, and they are aware of prices available in the major markets. As a result, they have an intimate understanding of their input markets. These colleagues are professional, well educated, tough, price sensitive negotiators, and they leverage their knowledge of the global market in their discussions with Tate & Lyle."); Michael Baroni, President of Specialty Food Ingredients of the Archer Daniels Midland Company, id. at 21:25-22:1, 24:19-25 ("[W]e know that our best customers have also purchased substantial quantities of Canadian and Chinese citric acid. If we had not responded to the presence of that large quantity of lower priced imported product in the marketplace by also lowering our prices, ADM would have been left with so few orders that our plant would have closed down long ago.").

Moreover, despite Plaintiffs' reliance on overselling evidence, this court has previously affirmed a finding of price suppression in tandem with a finding of mixed overselling and underselling. See Companhia Paulista de Ferro-Ligas v. United States, 20 CIT 473, 478 (1996). Thus, the Commission reasonably concluded based on the above that, particularly in a market in which "about a dozen sophisticated and powerful firms account[ed] for a substantial portion of total purchases," there was an effect on domestic merchandise prices by subject imports. Defendant's Opposition at 4-5; see Defendant-Intervenors' Response at 26 ("With a few major purchasers dominating the U.S. market and buying large volumes of both subject imports and domestic merchandise, and the observed razor thin differences in prices, it is hard to imagine a scenario in which the prices for domestic merchandise and subject imports could be completely de-linked, as suggested by [Plaintiffs].") (internal footnote omitted).

**C**
**The Commission's Non-Attribution Analysis Is Supported By Substantial Evidence**

"[A]fter assessing whether the volume, price effects, and impact of the subject imports on the domestic industry are significant, the statutory 'by reason of' language implicitly requires the Commission to determine whether these factors as a whole indicate that the [subject] imports themselves made a material contribution to the injury." Taiwan Semiconductor Indus. Ass'n v. United States, 24 CIT 914, 920, 118 F. Supp. 2d 1250 (2000) (quoting 19 U.S.C. § 1673d(b)(1)) (other quotations omitted).  The Commission cannot "simply not[e] a potential factor and issu[e] a conclusory assertion that such a factor did or did not play a major role in causing a material injury." Hynix Semiconductor, Inc. v. United States, 30 CIT 1208, 1226-27, 431 F. Supp. 2d 1302 (2006).  Instead, the Commission must "analyze compelling arguments that purport to

demonstrate the comparatively marginal role of subject imports in causing that injury." <u>Id.</u> at 1223.

Plaintiffs assert that "the Commission did not explain how it distinguished the role of intra-industry competition so as to ensure it was not attributing such affects [sic] to subject imports." Plaintiffs' Brief at 38.  For Plaintiffs, "[g]iven the Commission's price cap theory of causation, it was incumbent upon the Commission to explain how it ensured that the 'cap' it claimed to discern in the data did not reflect [intra-industry competition] rather than subject imports that consistently oversold domestic prices." <u>Id.</u> at 39.

The Commission reasonably explained and concluded that intra-industry competition was not the predominant source of the "cap" on prices.  The Commission conducted a non-attribution analysis, concluding that intra-industry competition, while present, "does not call into question the record evidence showing significant pricing pressure from cumulated subject imports from Canada and China, as described above." Final Determination at 31.  Although the Commission found that "intra-industry competition played a role in the inadequate price levels obtained by domestic products," <u>id.</u> at 31, it nevertheless determined that

> [t]he share of purchasers reporting that the market presence of subject imports tended to reduce contract prices was much larger than the share reporting that the presence of competing U.S. products tended to reduce such prices. Moreover, the competition between the three domestic producers continued in 2008 (as 2009 contracts were being negotiated) and did not prevent the industry from obtaining significant price increases as the presence of subject imports in the U.S. market diminished.

<u>Id.</u> at 31-32 (internal footnotes omitted). [28]

---

[28] Plaintiffs contend that the Commission relied on information outside of the POI to buttress its position. Plaintiffs' Brief at 35-36.  However, "[t]he Commission's analysis of demand and supply conditions clearly covered 2008, providing sufficient context by which to evaluate the negotiations of the 2009 contracts, inasmuch as they occurred in 2008." Defendant-Intervenors' Response at 32.

Although Plaintiffs provide reasonable arguments concerning the effects of intra-industry competition, they do not refute the Commission's conclusions.  While the Commission's explanation is brief, the Commission reasonably concluded, based on substantial record evidence, that subject imports materially contributed to the domestic industry's injury. <u>Id.</u> at 37.

**V**
**CONCLUSION**

For the reasons stated above, Plaintiffs' Motion for Judgment Upon the Agency Record is DENIED, and the Commission's Final Determination is AFFIRMED.


__/s/ Evan J. Wallach_____
Evan J. Wallach, Judge


Dated: May 11, 2011
      New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE

```
_____
                              :
SHANDONG TTCA BIOCHEMISTRY    :
CO., LTD., et al.,            :
                              :
          Plaintiffs,         :
                              :
     v.                       :
                              :
UNITED STATES,                :     Before:              WALLACH, Judge
                              :     Consol. Court No.:    09-00241
          Defendant,          :
                              :
     and                      :
                              :
CARGILL, INCORPORATED, et al.,:
                              :
          Defendant-Intervenors. :
_____:
```

## ORDER AND JUDGMENT

This case having come before the court upon the Motion for Judgment Upon the Agency Record filed by Plaintiffs Shandong TTCA Biochemistry Co., Ltd., et al. ("Plaintiffs") challenging the U.S. International Trade Commission's finding of material injury in Citric Acid and Certain Citrate Salts from Canada and China, Inv. Nos. 701-TA-456 and 731-TA1151-1152 (Final), USITC Pub. 4076 (May 2009) ("Final Determination"); the court having reviewed all papers and pleadings on file herein, having heard oral argument by each party, and, after due deliberation, having reached a decision herein; now, in conformity with said decision, it is hereby

ORDERED, ADJUDGED, and DECREED that Plaintiffs' Motion for Judgment Upon the Agency Record is DENIED and the Commission's Final Determination is AFFIRMED; and it is further

ORDERED that each party shall review the court's Opinion in this matter and shall in writing on or before Wednesday, May 18, 2011 notify the court whether any information contained in the Opinion is confidential. If a party determines that information needs to be deleted in the public version of the Opinion to be issued thereafter, that party shall identify such information, request the deletion of such information, and propose alternate language to replace such information. If a party determines that no information needs to be deleted, that party shall so notify the court.


                                        __/s/ Evan J. Wallach____
Dated: May 11, 2011                     Evan J. Wallach, Judge
       New York, New York